```
 1                  IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   BRANDEIS UNIVERSITY and      )  Docket No. 12 C 1508
     GFA BRANDS, INC.,            )
 4                                )
                      Plaintiffs, )
 5                                )
              v.                  )  Chicago, Illinois
 6                                )  October 18, 2012
     EAST SIDE OVENS, INC.,       )  9:30 o'clock a.m.
 7   et al.,                      )
                                  )
 8                    Defendants. )

 9           TRANSCRIPT OF PROCEEDINGS - STATUS, MOTIONS
               BEFORE THE HONORABLE RICHARD A. POSNER
10
     APPEARANCES:
11
     For the Plaintiffs:          QUARLES & BRADY, by
12                                MS. KRSTIN GRAHAM NOEL
                                  33 East Main Street
13                                Suite 900
                                  Madison, Wisconsin 53703
14
     For Defendant Keebler        MAYER BROWN LLP, by
15   Nestle, Famous Amos,         MR. A. JOHN PETER MANCINI
     Murray Biscuit:              1675 Broadway
16                                New York, New York 10019

17                                MAYER BROWN LLP, by
                                  MR. RICHARD M. ASSMUS
18                                71 South Wacker Drive
                                  Chicago, Illinois 60606
19

20
                      ALEXANDRA ROTH, CSR, RPR
21                     Official Court Reporter
                     219 South Dearborn Street
22                           Room 1224
                      Chicago, Illinois 60604
23                         (312) 408-5038

24

25
```

```
 1   APPEARANCES: (Continued)

 2   For Defendant Unilever        NOWACK AND MACEY LLP, by
     and Conopco:                  MR. ANDREW DYLAN CAMPBELL
 3                                 100 North Riverside Plaza
                                   Chicago, Illinois 60606
 4
                                   AXINN VELTROP & HARKRIDER LLP, by
 5                                 MR. EDWARD M. MATHIAS
                                   MR. JASON T. MURATA
 6                                 90 State House Square
                                   9th Floor
 7                                 Hartford, Connecticut 06103

 8   For Defendants Bremner        GRADY PILGRIM CHRISTAKIS
     and Topco:                    BELL LLP, by
 9                                 MR. JOHN FRANCIS GRADY
                                   53 West Jackson Boulevard
10                                 Suite 1515
                                   Chicago, Illinois 60604

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      (Proceedings had in open court:)

2           THE CLERK:  12 C 1508, Brandeis University versus East

3  Side Ovens, Inc.  Please be seated.

4           THE COURT:  Good morning, everybody.

5           So we are here to discuss the motion to compel,

6  motions, and responses and so on.  So let me begin.  I have

7  some questions for Brandeis.  So why don't we --

8           MS. NOEL:  Your Honor, Kristin Noel on behalf of the

9  plaintiffs.

10           THE COURT:  Well, you want to go to the --

11           MS. NOEL:  Absolutely.

12           THE COURT:  Is there a podium?

13           MS. NOEL:  Absolutely.

14           THE COURT:  So you want to state your name.

15           MS. NOEL:  Kristin Noel, N-o-e-l, from Quarles &

16  Brady, appearing on behalf of Brandeis and GFA.  Good morning,

17  your Honor.

18           THE COURT:  Yes.  So I am looking first at your

19  request for a narrative or correlation short linking recipes to

20  products.  What is the purpose of this?

21           Now, what you want -- now, do you have the records,

22  and you just want the narrative?  Or do you -- what do you need

23  the records to?

24           MS. NOEL:  The short answer, your Honor, is, we would

25  like the records to the extent they exist as well, generally

1    speaking.  But on certain particular issues, if the defendants

2    make representations, for example, that the formulation has not

3    changed over time and we can use the representative document

4    and that will correlate to all the products manufactured and

5    sold in any particular time period, we would accept that

6    representation.

7         The purpose, getting to your first question, your

8    Honor, is, you know, we need to establish a damages base.  The

9    defendants have asserted at various points in this litigation

10   that plaintiff should not be allowed to rely, for example, on

11   one or two tasks of their products at any given snapshot in

12   time, because they may have changed their formulations over

13   time.  So to establish liability and the full spectrum of

14   damages, we need to know what formulations were used when, and

15   what their sales were for that time period.

16        THE COURT:  Why is that relevant to liability?

17        MS. NOEL:  Well, for example, your Honor, if we take

18   Keebler, one of the cookie defendants, one of the claims

19   asserted against them is the use of the margarine in the

20   cookie.  And so we need to look to their manufacturing process

21   and determine, in fact, and make -- come forward with proof

22   that there is, in fact, a margarine being used in that cookie.

23        THE COURT:  But you don't need quantities for that?

24        MS. NOEL:  Quantities --

25        THE COURT:  You just need one cookie, don't you?

5

```
1              MS. NOEL:  We believe we just need one cookie.  But --
2              THE COURT:  For liability, yes.
3              MS. NOEL:  Yes.  But if defendants are going to claim,
4     for example, that they changed their formulation and expect an
5     offer of proof from plaintiffs, particularly if they want --
6              THE COURT:  No, then you want another.  Right.  You
7     want one cookie with each recipe, right?  For each recipe, for
8     each different recipe, you want a cookie.
9              MS. NOEL:  That's correct.
10             THE COURT:  That's for liability.  Okay.
11             Now, for damages, for damages you want to have their
12    sales of every different -- every cookie with a different
13    recipe.  You want the sales of those cookies.
14             MS. NOEL:  Correct, your Honor.
15             THE COURT:  How much of that information has -- forget
16    the narrative.  But how much of those data have they produced?
17             MS. NOEL:  It's different by defendant, your Honor.
18    We have been provided very little data from Unilever and
19    Conopco that we can make sense of.  They certainly now provided
20    I believe it's about 400 representative documents that
21    supposedly we can review and infer and correlate a SKU number
22    to a formulation, and then we can take that information and
23    compare it to their sales figures.
24             We have been unable to do so.  We do believe that
25    defendants generated these documents in the ordinary course of
```

1  business, and that they have a very good understanding of

2  what -- what products they're selling to the public.

3          Defendant Keebler, we do recently have acquired much

4  more information.  It's not a complete package.  But, for

5  example, they point to their operating manuals, and they point

6  to specific Bates numbers and say, here are the SKU numbers.

7          The problem we have with that is, we've compared their

8  operating manuals to their sales documents and their

9  nutritional labeling documents, and there are other SKUs.  So

10  there are other at least numbers associated with other batches

11  of the accused products that aren't indicated on the operating

12  manuals.

13          We've asked them to represent that we can take all of

14  the SKUs for, let's say, cookie X and ask them to represent

15  that we can look just at that operating manual.  But we haven't

16  gotten that clarity.

17          THE COURT:  But so what you would like ideally would

18  be a list of all the different cookie recipes by defendant and

19  all the sales of cookies they had made of using that recipe.

20          MS. NOEL:  Yes.

21          THE COURT:  So is that their sales or retail sales.

22  That you want?

23          MS. NOEL:  Your Honor, that would be their sales.

24          THE COURT:  Their sales.

25          And what would then be the theory of damages?  I mean,

1    suppose they have sold -- I don't know what the units of --

2    they sold say a thousand cookies using a recipe which, say, is

3    found to infringe.  So then how do you calculate damages from

4    that?

5           MS. NOEL:  For a cookie, your Honor, it's mostly

6    likely a reasonable royalty.  And so we would -- you know,

7    we're obviously working with our expert, damages expert, and

8    our economist right now to come up with an appropriate

9    reasonable royalties using the factors provided by the Federal

10   Circuit.  And so it would be a royalty.

11          THE COURT:  Factors like what?

12          MS. NOEL:  The value or desire by the purchasing

13   public for a cookie that is -- has no trans fat, for example,

14   and has the fat profile such that you can --

15          THE COURT:  How do you determine -- how do you

16   attribute sales to a particular component?

17          MS. NOEL:  Well, I don't have the full universe for

18   your Honor today.  But I might suggest that their marketing

19   materials, for example, if they're promoting their cookie as

20   trans fat free and having no cholesterol, that is attributable

21   to the fat blend that is used in the cookie.

22          And so --

23          THE COURT:  No, no, the question is, people buy a

24   cookies for a variety of reasons.  So one might be the

25   cholesterol.  But how would you figure out what sales or

1    revenues, revenue rather than physical output, was attributable

2    to the advertising of the cholesterol rather than taste of the

3    cookie or --

4         MS. NOEL:  Sure.  Sure.  And those concepts, your

5    Honor, are related.  If you change the cholesterol profile such

6    as it's perfectly healthy, you're going to end up with a bad-

7    tasting cookie.  The beauty of the blend that is patented by

8    Brandeis and licensed to GFA is that you have a good-tasting,

9    good-feeling cookie that is still -- does not negatively impact

10   the cholesterol profile in the body and is trans fat free.

11        We are pulling a wealth of information from various

12   data collectors, such as Nielsen, for example, that study why

13   consumers buy certain products.  Companies such as Smart

14   Balance and the defendants also do on their own as their

15   ordinary course of business surveys of the public.  What is

16   important?  Is this patented feature important?

17        And so our experts will draw from all of those sources

18   of data and do comparative, for example, to non-infringing

19   alternatives.  And --

20        THE COURT:  Do they -- have you collected from them,

21   gained from them in discovery, their internal studies of the --

22   presuming they may do some cause to this cholesterol-altering

23   ingredient.  So have you gotten their internal documents in

24   which they explain why it's worthwhile investment, what they

25   expect in way of additional sales or additional revenues?

1          MS. NOEL:  We have, your Honor, received some limited

2    documents that I would consider directed towards that issue.

3    We are starting the 30(b)(6) depositions next week.  I believe

4    we have no less than five that we are taking on Tuesday, for

5    example.  And some of the topics are directed to those

6    questions, those very questions.

7          THE COURT:  Okay.  Well, thank you.

8          Let me hear now from the defendants about this, the

9    plaintiffs' request for the narrative or the correlation.

10          MR. ASSMUS:  Good morning, your Honor.  Richard Assmus

11    on behalf of Nestle USA and Keebler Company.  That's

12    A-s-s-m-u-s.

13          Your Honor, the motion was brought just against

14    Keebler Company.

15          THE COURT:  I'm sorry.  You represent who?

16          MR. ASSMUS:  Nestle USA and Keebler.

17          Your Honor, of those two clients, only Keebler was the

18    subject of the motion to compel, as you know, also Unilever and

19    Bremner, several other defendants.  But Nestle was not a

20    subject of the motion.

21          THE COURT:  Okay.  So Brandeis is entitled to, you

22    know, have information about -- about the number of sales or

23    the sales revenues, I guess, from each recipe, right?

24          MR. ASSMUS:  Yeah, we do not disagree with that, your

25    Honor.  We have produced a number of things bearing on that.

1    We produced the nutritional label information.

2              THE COURT:  What do you mean?  Why can't you just give

3    her a list of all the recipes and next to recipes how many or

4    what cookie revenues were derived from the cookies that were

5    based on that recipe?

6              MR. ASSMUS:  We believe we have produced exactly that

7    information, your Honor.  Spreadsheets of sales by SKU number.

8    The SKUs are then correlated to recipes through the operating

9    manuals.

10             I think part of what's going on --

11             THE COURT:  Well, how am I supposed to reconcile --

12   how am I supposed to decide between you and Ms. Noel, who says

13   she hasn't received all this information?  What am I supposed

14   to do?

15             MR. ASSMUS:  I think, your Honor, the plaintiffs were

16   somewhat premature in filing the motion in that we were

17   discussing these things.  I think part of what's going on here,

18   your Honor, is that our executives actually know the documents.

19   They're looking at them cold.  We understand they need some

20   help in understanding how the things match up, how the

21   company's internal processes are for labeling SKU numbers.  For

22   example, you might have a cookie that sold under one SKU

23   number.  But then during Halloween, you know, it sold with a

24   pumpkin on it and given a separate SKU.

25             We understand they may need some help correlating

1    those things.  We believe, your Honor, that's probably best

2    solved by discussions between counsel, which were ongoing at

3    the time they filed the motion, as well as the depositions that

4    they noticed up.

5         In fact, Keebler's 30(b)(6) witness on both recipes

6    and damages are set for tomorrow and October 23.  We would

7    expect that through that information and working together with

8    counsel further, we should be able to answer their questions

9    about -- about the correlation.

10        THE COURT:  Well, I don't understand.  Why can't you

11   just give them a list with all the recipes on the left, and on

12   the right the sales of cookies for each of the recipes?

13        MR. ASSMUS:  We can give them that, your Honor.  We

14   can.  And we believe we've given that information.  They may

15   have trouble --

16        THE COURT:  Why don't you just give them, you know,

17   two columns.  One has the recipes, one has the sales.

18        MR. ASSMUS:  Your Honor, we can put that together.

19        THE COURT:  Okay.  Okay.  Thanks.  Let me move -- let

20   me move on to a second position, also involving Keebler.  I

21   think this is the same question.  The first point was Brandeis'

22   request for this narrative or correlation short.  But if you

23   provide, you know, this table I'm suggesting with the recipes

24   on one side and the sales on the other, that I think satisfies.

25        Is that what you are looking for, Ms. Noel?

1          MS. NOEL:  Yes, your Honor, with the caveat that the

2    recipe can't just be a list of ingredients, but it has to be

3    the actual manufacturing process.

4          THE COURT:  What do you mean?

5          MS. NOEL:  They have, for example, an operations

6    manual that it's a little high level.  But if they could just

7    say for these SKU numbers look to this manual, we would be

8    satisfied with that.

9          THE COURT:  Okay.  So you want the recipe, but you

10   also want the process by which the recipe is translated into

11   the product.

12         MS. NOEL:  That's correct, your Honor.

13         THE COURT:  Is that feasible?

14         MR. ASSMUS:  Yes, your Honor.  We produced the actual

15   manual that's used in the plant to make the cookie.  There is

16   at this point for Keebler just three cookies accused, your

17   Honor.  Vanilla Wafers, Mini Vanilla Wafers and Chocolate Chip

18   Lovers Chips Deluxe.  We produced those operating manuals, and

19   those operating manuals, your Honor, contain historical

20   information about the change history of those operating

21   manuals.  That's what I would call the bible, your Honor, by

22   which a factory actually makes the cookies.

23         It -- we've also produced nutritional label

24   information with respect to each of those cookies that tell

25   them all the ingredient?

1      I should point out, your Honor, the reason we think

2 that the process information -- or we think they think the

3 process information is relevant is, as you know, your Honor,

4 the '192 patent is a patent on a margarine, and we sell

5 cookies.  And, in fact, the fat that Keebler puts into its

6 cookies is not a margarine.  It's what's called a shortening.

7 It's not emulsion as required by your Honor's claim

8 construction.

9      Or so we believe that somehow they think not that we

10 buy a margarine and not that we sell a margarine, but at some

11 point in the processing of a cookie maybe a margarine is

12 created.  That's I think one of the reasons, the pretty tenuous

13 link here, your Honor, between their patent and potential

14 damages.

15      But just -- that's by way of background why this

16 processing information may be relevant.  In fact, we produced

17 it.

18      THE COURT:  So you are going to produce -- so you are

19 going to give a list of recipes and the sales for the cookies

20 for each -- made from each recipe.  And Brandeis has this

21 operating manual by which they can associate each of these

22 recipes with a production process.

23      MR. ASSMUS:  That's correct.  In fact, your Honor, the

24 operating manual contains a list of SKUs that match up the

25 operating manual with --

1    THE COURT:  A list of what?

2    MR. ASSMUS:  A SKU, it's S-K-U, pronounced SKU.  I

3  confess I don't know what the abbreviation stands for.  It's a

4  retail term to determine a particular cookie that's sold in a

5  store.  It's -- you might think of it as the bar code that you

6  get scanned at the grocery store, the way sales of a particular

7  format of a cookie are tracked.

8    THE COURT:  Okay.  So I think that should take care of

9  -- how long will it take to furnish this?

10    MR. ASSMUS:  I think it's -- we can furnish it very

11  quickly, your Honor.  I -- we obviously need to talk to the

12  client about the information.  I don't think it should be more

13  than a matter of days before we can put that information

14  together.  In fact, we think it's just a matter of collating

15  the information.  The documents we already provided to them.

16    THE COURT:  Okay.  Thanks.

17    Is that satisfactory, Ms. Noel?

18    MS. NOEL:  It is welcome, your Honor.  I do note that

19  the 30(b)(6) on liability is tomorrow.  And the damages I

20  believe is next week Friday.  So the sooner we get that

21  information, there will be fewer disputes, for example, on

22  reconvening those depositions.

23    MR. ASSMUS:  Your Honor, we will endeavor to do it as

24  soon as possible, as well as make sure they have an opportunity

25  to walk through those questions with our witness.

1    THE COURT:  Okay.  Thank you.

2         Okay.  The next issue I have on my list is the

3    question involving Conopco.  And as I understand, Brandeis'

4    concern is, there is an exhibit which lists something called

5    MIX ICB Light VTF Oil Phase as ingredient, and a margarine

6    called I Can't Believe It's Not Butter.  And I guess Brandeis

7    wants to have the component oils disclosed, is that correct,

8    Ms. Noel?

9         MS. NOEL:  We would like the similar information as to

10   what Keebler just provided.  Keebler's operating manuals are --

11   were far easier for a third party to decipher than, for

12   example, Unilever and Conopco.

13        We don't have any consolidated documents.  We don't

14   even have set universe of documents that show their ingredients

15   and their manufacturing process.  They've identified

16   approximately 400 examplar documents for us to review.  They

17   are big spreadsheets and reports.  They are to an outsider not

18   decipherable.

19        So we would request the same information that Keebler

20   has just agreed to provide from Unilever and Conopco.

21        THE COURT:  Thank you.

22        So, yes.  Someone want to speak for Conopco?

23        MR. MATHIAS:  Good morning, your Honor.  Edward

24   Mathias on behalf of Unilever and Conopco.

25        Your Honor, what we can provide is the identifying

1    number for the formulation, and match that to individual sales

2    that were made throughout the relevant time period.  We are

3    happy to provide that.  And if that satisfies plaintiffs'

4    request, then I think that settles the matter.

5         THE COURT:  Will that show the ingredients in this,

6    the actual oils that are in this MIX ICB?

7         MR. MATHIAS:  The -- that spreadsheet that we would

8    create could not show that.  If I could explain your Honor,

9    Exhibit C and D attached to our papers have an identifying

10   number that provide -- that list all of the ingredients.  And

11   these are the documents that we have pointed to that set forth

12   in our production what the ingredients are for these

13   formulations, which have changed over time.  But there is an

14   identifying number that they are -- they can be provided and

15   they have been provided, from which they can determine all of

16   the ingredients.

17        THE COURT:  And where is that document?

18        MR. MATHIAS:  It's Exhibit C and D to our -- to our

19   opposition.  Exhibit C is colorfully titled, BOM Explosion.

20   And Exhibit D is a -- what's called an Innerspec data sheet,

21   which contains all the relevant information they need to

22   determine the date on which the formulation was operative and

23   the corresponding number that we can then link to sales.

24        So we have provided all of the relevant information to

25   the plaintiffs.  And we're happy to provide a spreadsheet that

1  links this formulation number to the actual sales to the

2  retailers.

3           THE COURT:  So you are saying that these two exhibits

4  actually list the oils that are in your product?

5           MR. MATHIAS:  Yes, your Honor.

6           THE COURT:  Okay.  Then let me ask Ms. Noel whether

7  she has everything she needs.

8           MS. NOEL:  Your Honor, we have been provided with a

9  chart of approximately 400 Bates numbers that contain documents

10  similar as to these.  And we are told they are examples from

11  their production of approximately 5 million documents.  That we

12  should go document by document and try to correlate not just

13  the ingredient list.

14           We need the manufacturing process.  And we need date

15  certain.  This went into production on such and such --

16           THE COURT:  But let me just understand.  Do you know

17  what oils are in this, in each of these products?

18           MS. NOEL:  If I had this document for each and every

19  different SKU, I would believe counsel's representation that

20  all the ingredients are listed on here.  A lot of this

21  information is in shorthand.  It was designed by them for

22  internal use, not for our use.

23           It would be incredibly time-consuming and involve a

24  lot of guesswork for us to go document by document, looking at

25  these, figuring out the ingredient list, and then correlating a

1    manufacturing process from it.

2           The dates that they list too on most of these

3    documents are one date.  We asked them, is that the date it

4    first became -- you first produced?  When is the end date?

5    We're not provided with that information.  In fact, all the

6    dates we're told are estimates.

7           This -- when you balance the hardships on Unilever

8    Conopco compared to Brandeis in trying to decipher these

9    hundreds of documents, your Honor, we don't think this

10   adequately meets the standard in 33(d), and we again request

11   some --

12          THE COURT:  So this is -- so you want the same

13   information that you want from Keebler?

14          MS. NOEL:  Yes, your Honor.

15          THE COURT:  The recipe, the sales per recipe, and an

16   operating manual, which enables you to figure out the

17   production process for each --

18          MS. NOEL:  Right.

19          THE COURT:  -- of the recipes.

20          MS. NOEL:  Along with the dates would be helpful.  But

21   exactly how your Honor summarized, that's the information we

22   would request.

23          THE COURT:  So, Mr. Mathias, why can't she have that?

24          MR. MATHIAS:  Your Honor, we would undertake the same

25   process that they would to -- to provide the information that

1  they're asking for.  And under 33(d) the burdens are

2  substantially equivalent.  And, therefore, it's all there.

3         THE COURT:  I don't understand that.  Surely it is

4  easier for you to summarize and make inferences and so on from

5  your own documentation than it is for an outsider.

6         MR. MATHIAS:  Your Honor, these documents, Exhibit C

7  and D, are form documents that are provided in the production.

8  If I can direct your Honor to --

9         THE COURT:  But what she wants is, she wants the

10 recipes.  She wants the number of sales per recipe, date, and

11 some key enabling her to connect each of the recipes with the

12 process by which the product is manufactured.  So why don't you

13 provide it the way Keebler is providing it?

14        It's easier for you to provide it than for them to try

15 to figure out what these documents are.  They are your

16 documents.

17        MR. MATHIAS:  Your Honor, we can provide them a number

18 that corresponds to the sale.

19        THE COURT:  Look, you provide them the same

20 information that Keebler is going to provide.

21        MR. MATHIAS:  We're happy to do that, your Honor.  And

22 as far as -- can I speak to the manufacturing --

23        THE COURT:  You do it identically the way Keebler is

24 going to do it.

25        MR. MATHIAS:  That would be fine, your Honor.

1     THE COURT:  Thank you.

2     Now, next I have a question about Bremner.  So

3  Bremner, this is about its pre-electronic records.  And

4  Bremner's response to the motion, it's a good response and

5  implausible, explaining, you know, a lot of difficulties in

6  dealing with all these documents that apparently are not, you

7  know, well sorted and old and so on.

8     So let me ask Bremner, a Bremner lawyer.

9     MR. GRADY:  Good morning, your Honor.  John Grady for

10 Bremner.

11    THE COURT:  Mr. Grady.  So for these paper documents

12 of some years ago, so is there some kind of index or what?

13    MR. GRADY:  There is not.

14    THE COURT:  Pardon?

15    MR. GRADY:  There is not.

16    THE COURT:  There is no index.

17    MR. GRADY:  There is no index.  They are contained in

18 sort of a historical group of boxes.

19    THE COURT:  So these are in boxes.  And how much is in

20 there, how many documents?

21    MR. GRADY:  We -- it's hundreds of documents --

22 sorry -- hundreds of boxes.

23    THE COURT:  Hundreds of boxes.

24    MR. GRADY:  Hundreds of boxes spread across eight

25 different factories.

1    THE COURT:  Now, so that was about six years ago or
2  so, or six to nine years ago?
3    MR. GRADY:  Yes.
4    THE COURT:  Okay.  So have your recipes changed since
5  then?
6    MR. GRADY:  I don't know that, your Honor.  What I
7  know is this, however, and this may -- this may ease things.
8  We can give an estimate within a month or two of when
9  production began and when production ended for a given product.
10  I asked my client whether they might be able to stipulate to a
11  date certain within that range.  And we are sort of thinking
12  about that and trying to.
13    But what we're dealing with here is not just we have
14  no idea when these things began and ended.  We think we can
15  narrow it within a pretty narrow date range, so that it might
16  not be material what the exact date is.  That would avoid
17  having to go to factories and through dusty boxes.
18    I am not sure that's been suggested to Ms. Noel.  This
19  sort of came up yesterday in preparation for this motion.  But
20  we have estimated a range for every product of dates.
21    THE COURT:  When you say estimate, is this sampling
22  or --
23    MR. GRADY:  It's based on memories of --
24    THE COURT:  Memories of individuals.
25    MR. GRADY:  Yes.  And that's really what it is, Judge.

1    THE COURT:  So they remember.  They have a

2    recollection of how much of the different -- of the cookies

3    based on different recipes they sold?  Is that --

4    MR. GRADY:  They manufactured, yes.

5    THE COURT:  They manufactured.

6    MR. GRADY:  And the 30(b)(6) deposition, which is

7    coming up for my client next week, two days, could better

8    define their memory.

9    THE COURT:  Ms. Noel, is that satisfactory?

10   MS. NOEL:  Your Honor, Bremner and Topco present

11   perhaps the more complicated situation for us.  And we have

12   heard varying stories what the problem in gathering and

13   producing this information is.

14   THE COURT:  Now, is the concern just about the paper,

15   the paper records, or rather than the electronic?

16   MS. NOEL:  No, your Honor, it's not.  We have -- we

17   have been -- we have not been provided any detailed

18   manufacturing process documents, even for the recent years.  We

19   have been provided some high-level mixing reports.  But they

20   are clearly not the type of documents, in our estimation, that

21   one would actually use to manufacture the cookies.

22   So we, in part, want more specific documents even for

23   the last six years.  We've been advised by Bremner and Topco

24   that that is too technical to be provided in interrogatory, and

25   we should conduct our 30(b)(6).

1         Without the documentation and without the narrative

2    response, it puts a -- particularly a seven-hour deposition, it

3    will be very logistically difficult.  We believe they know how

4    they make their cookies.  And we would request, if only for the

5    last six years, that they at least provide the more detailed

6    information on that.

7         We have asked for assurances on the dates, and we

8    would welcome a stipulation from them that we can rely on

9    certain dates associated with certain recipes.  And we have

10   also recently received a representation from Bremner and Topco

11   that they will provide us the rest of the SKU numbers.  And

12   that certainly will help us out quite a bit.

13        THE COURT:  Are you looking for the same information

14   you want from Keebler and Conopco?

15        MS. NOEL:  Ideally, your Honor, yes.  And we believe

16   they must know that, at least for the last six years.

17        THE COURT:  For the electronic, yes.

18        MS. NOEL:  And we have repeatedly asked, you know, if

19   we have to go out to your facility, tell us which ones to go

20   to.  Give us an idea of how many documents we are talking

21   about.  And we've been repeated told, we don't know.

22        So we're not sure that an adequate investigation has

23   really been done into what the universe of these documents and

24   what these facilities actually have.

25        THE COURT:  Well, now you are talking about the

1    documents, not the electronic era.  So what is it you want them

2    to do with the documents?

3              MS. NOEL:  Your Honor, we would ask for the same

4    relief that Keebler and Unilever is providing, at least for the

5    period the last six years.

6              THE COURT:  That I understand, the last six years.

7    But for the paper, the paper era that preceded it.

8              MS. NOEL:  For the paper era we'd expect that some

9    investigation take place by counsel with their client as to

10   really are there documents for the accused products really at

11   all eight facilities.  We've heard varying answers from counsel

12   on that.  And what is the universe?  And how are these

13   documents stored?  Are they just in a warehouse in boxes?  And

14   we are going --

15             THE COURT:  Well, he said they are in a hundred boxes,

16   or hundreds of boxes.  He said they are in hundreds of boxes.

17   So what do you want -- what do you want them to do?

18             MS. NOEL:  We want them to direct us to which facility

19   has the relevant hundreds of boxes.

20             THE COURT:  Wait.  I'm puzzled by that because with

21   the Keebler and Conopco, you want them to produce for you a

22   summary document, not the underlying documentation from which

23   it's based.  Why isn't that what you want from Bremner?

24             MS. NOEL:  It absolutely is what we want from Bremner.

25             THE COURT:  So why do you want to look in those boxes?

1          MS. NOEL:  Your Honor, we have been told that we're

2     not going to get a narrative answer, and it would be too

3     difficult for them to get it, and thus we should get it.  We

4     certainly think it's appropriate that they provide us the

5     narrative answer, and we'd accept that.

6          THE COURT:  I thought Mr. Grady said that they were

7     going to, you know, from their memory, best they could they

8     would provide an estimate.

9          Is that correct?

10         MR. GRADY:  That's correct, your Honor.  I want to

11    make sure that I understand what we're talking about because we

12    got date ranges on the one hand, and we got mixing information

13    on the other.  When I was talking about the estimate, I was

14    talking about date ranges.

15         The subject of the mixing information, how the product

16    is manufactured, that's sort of something else that I haven't

17    addressed with the Court yet.

18         THE COURT:  Well, what she -- as I understand it, what

19    Ms. Noel wants, you know, and Keebler and Conopco will provide

20    or have provided or in process of providing, is the recipe, the

21    sales of the cookies for each recipe, and in what period of

22    time, right?  So can you provide that for either the electronic

23    period or the paper period that preceded it?

24         MR. GRADY:  I believe we provided sales information.

25    I don't think that what's up this morning is anything to do

1   with sales.  I think it's date ranges and mixing, from what

2   we're talking about right now.  So the answer is --

3           THE COURT:  By mixing, you mean the recipes?

4           MR. GRADY:  We've given the recipes.  We've given

5   ingredients.

6           THE COURT:  What's mixing?

7           MR. GRADY:  Mixing, they want to know what kind of

8   equipment is used in the mixing process.

9           THE COURT:  So this is production, production.

10          MR. GRADY:  Production, yeah.

11          THE COURT:  That's what they want to have, right, be

12  able to figure out what production process was used for each

13  recipe.

14          MR. GRADY:  Correct.  And our challenge there, Judge,

15  unlike other manufacturers, which may have brand-new equipment,

16  we have a hodgepodge of used equipment that manufactures these

17  cookies.  So the way that it's mixed for each different place

18  varies on the specific type of equipment.

19          And we don't have a book like we heard counsel talk

20  about before, the bible of production.  We have individual

21  people who have learned these -- to use pieces of machinery as

22  they arrived on the factory floor.  And then they are the ones

23  who sort of have the expertise to the level of detail that

24  counsel wants.

25          We've given ingredients, amount, order, method of

1  adding and combining.  They now want to say sort of, well, is

2  it a right-hand turn or left-hand turn or something?  But we

3  don't have that written down anywhere.  That's in people's

4  heads.

5         THE COURT:  Well, is that a problem?  Why do you need

6  information at that level of detail?

7         MS. NOEL:  I -- you know, I don't think it's quite at

8  the right-hand turn, left-hand turn level, your Honor.  But it

9  is at the manufacturing level.  We find it really hard to

10  believe that people show up to work every day in a factory, and

11  there is no written standard to make cookies that are sold in

12  stores all across America.  We just -- we know they must exist.

13  It's not in one guy's memory in eight different plants.  We

14  just frankly don't believe that.

15         Why we need the manufacturing process, again, is,

16  these cookies are made with margarines.  And we strongly

17  suspect that when we put on our manufacturing and our various

18  liability experts and we say, here are the ingredients, here is

19  where they add, here is where they make a margarine or add a

20  margarine, they're going to say, no, that might be at factory

21  one through eight.  Or, no, that's changed over time.  Or, no,

22  we don't use any uniform process.  You have to prove it for

23  each and every batch of cookies.

24         And if they're going to hold us to that offer of

25  proof, we need to have the information.  And clearly they know

1    how they make their cookies.

2         MR. GRADY:  This is exactly the kind of thing, Judge,

3    that can be asked in a 30(b)(6).  I don't want to be in a

4    position of providing evidence with how my client does things.

5    But they're going to talk to him on Tuesday and Wednesday.  If

6    they don't believe counsel, maybe they can ask the actual

7    clients and see how things are done.

8         THE COURT:  Well, have you visited any of their

9    factories?

10        MS. NOEL:  We haven't, your Honor, because we never

11   received confirmation of which factory contained which

12   information.  And now we're hearing that there are no

13   documents, that's in people's heads.

14        MR. GRADY:  No, that's with respect to mixing.  The

15   date ranges are something else.  The date ranges are in the

16   documents.

17        MS. NOEL:  Fair enough.

18        With respect to mixing, how are they going to prepare

19   this 30(b)(6) witness for Tuesday on the manufacturing

20   processes and protocols for all eight factories if they can't

21   give us any documents or put in any narrative form for that

22   deposition so that we have a baseline and we know we're going

23   into with a deposition?  How is that witness going to be

24   prepared?

25        They either have the information or they don't.

1      MR. GRADY:  Judge, there is no documentation of the

2  kind she is describing beyond what we've produced.  We produced

3  all the ingredients and what goes into it.

4      THE COURT:  So there are actually no written

5  instructions for people in the plant as to how to make the

6  cookie?

7      MR. GRADY:  Not to the level of detail that she's

8  talking about, which is how the ingredients are processed

9  before and during the manufacturing process.  I mean, that's --

10  what she's talking about, I believe, goes to kind of maybe what

11  we're talking about before, which is whether something becomes

12  margarine or not.  And we're just -- we are -- we don't have

13  that level of detail written down.

14      THE COURT:  I don't understand.  So what -- I've never

15  been in a cookie factory.  But there must be written

16  instructions as to how the workers produce the cookie, right?

17      MR. GRADY:  Well, we have produced, Judge, tables that

18  show ingredients, order, how mixed.

19      THE COURT:  So what is it that's missing, Ms. Noel?

20      MS. NOEL:  It's just -- it's about as high level as

21  Mr. Grady suggests.

22      THE COURT:  What specifically would you be interested

23  in?

24      MS. NOEL:  When they mix their oils, how do they do

25  it?  When --

1          THE COURT:  What do you mean, how do they mix the oil?

2          MS. NOEL:  Do they make an emulsification, for

3 example.

4          THE COURT:  Pardon?

5          MS. NOEL:  Do they make an emulsification, for

6 example, of ingredients such that it constitutes a margarine.

7          Now, we looked through.  In the most recent Bremner

8 production we have found documents where they have a consultant

9 instructing them on the accused vanilla wavers.  One, never use

10 any liquid shortening.  Always use cubed or rotated shortening.

11 The idea of liquid or rotated shortening isn't in their

12 manufacturing process that they've given us.  Store the cubed

13 shortening at 60 degrees or cooler.  Do not bring the entire

14 pallet and let it sit in the mixing room.  Always maintain a

15 dough temperature at X degrees.

16          THE COURT:  So that's the level of information that

17 you want?

18          MS. NOEL:  Yes.  What -- what do they tell the guys

19 who work on the floor?  How do they make the cookies?

20          THE COURT:  Yes, so it sounds like there would have to

21 be written instructions for what Ms. Noel just described.

22          MR. GRADY:  Judge, we are told that there are not.

23 And I mean --

24          THE COURT:  I don't believe it.

25          MR. GRADY:  That's why --

```
 1          THE COURT:  I don't believe it.

 2          MR. GRADY:  Well, I will be --

 3          THE COURT:  I mean, that's very complicated.  What,

 4   you have some worker who memorizes that?  Or he makes it up on

 5   the spot?  If he memorized it, presumably there would be a

 6   document that he memorized.

 7          MR. GRADY:  There could certainly be a process by

 8   which --

 9          THE COURT:  What she described, is that something --

10   what she just read, do you hire a worker and someone says,

11   well, this is what you do.  And you don't give him anything to

12   read.  You just tell him, you do this, you do that, you don't

13   do that.  And he goes and does it?  No.  That can't be right.

14   It will be a disaster.

15          No one is going to remember that list of directions.

16          MR. GRADY:  Judge, all I can tell you is what I am

17   being told by --

18          THE COURT:  Well, I don't believe it.  It is too

19   implausible.  There have to be written instructions

20   corresponding to what she just read that are given to the

21   workers.

22          MR. GRADY:  I would be happy to go to my client again.

23          THE COURT:  Well, I am not satisfied with your client.

24          So do you want to go visit their factories and watch

25   them making this stuff and ask them whether there is documents?
```

 1    Is that what you want to do?

 2            MS. NOEL:  Your Honor, if Topco and Bremner continue

 3    to refuse to provide this information, we may be left with no

 4    choice.  We certainly with expert reports -- and we thank your

 5    Honor for extending our expert reports by two weeks.

 6            But with this time frame and with the fact that I

 7    think we have 12 depositions in two weeks, including five on

 8    Tuesday -- we have to take five 30(b)(6) depositions on Tuesday

 9    and prepare expert report.  If we have to go to eight different

10    factories, we -- we hope that your Honor --

11            THE COURT:  Why do you have to go to eight?  Why don't

12    you just go to one?

13            MS. NOEL:  Because we have been represented, I think

14    counsel represented today, that they use a hodgepodge of

15    different manufacturing processes.  If they will represent that

16    this is how it's done at -- in making their cookies, then I

17    just cannot believe they make their cookies in various

18    different ways.

19            We believe that they should be ordered to provide us

20    information.  They'll provide what they provide.  And to the

21    extent we find out later that there was further information, we

22    think sanctions should be appropriate.

23            THE COURT:  You are regulated by the agriculture

24    department, aren't you?

25            MR. GRADY:  Yes, we are, Judge.

1    THE COURT:  And they actually let workers make food

2  without having any instructions?

3    MR. GRADY:  Your Honor --

4    THE COURT:  I don't believe that.

5    MR. GRADY:  I don't think there are no instructions.

6    THE COURT:  Well, where are the instructions?

7    MR. GRADY:  I don't know whether the instructions are

8  oral or --

9    THE COURT:  They can't be oral.  You can't give

10  complicated oral instructions to people making food.  That's

11  totally irresponsible.

12    MR. GRADY:  We haven't --

13    THE COURT:  What, you put them through some

14  memorization test, say, these are the instructions?  You reel

15  them off.  Now repeat them repeat back.  Now repeat them.

16  Repeat them to me so I know you know them.

17    MR. GRADY:  Your Honor, I would be -- what I would ask

18  is that --

19    THE COURT:  I don't believe any of this.

20    MR. GRADY:  If I can go back to my client --

21    THE COURT:  You go back and you come back with the

22  written instructions.  If there are no written instructions, I

23  am going to report you to the Department of Agriculture.  You

24  are making cookies without instructing the workers in writing

25  as to how to make them.  That's what you are telling me.

1     MR. GRADY:  Your Honor --

2     THE COURT:  I'll call up the Department of Agriculture

3  and say, it looks like this company is producing food in a

4  dangerous and irresponsible fashion.

5     MR. GRADY:  Judge, I need to clarify for the record

6  that I have not represented to the Court that there are no

7  instructions.

8     THE COURT:  You certainly have.

9     MR. GRADY:  No, your Honor.

10    THE COURT:  You have said there are no written

11 instructions.  You are saying these oral instructions.

12    MR. GRADY:  I have --

13    THE COURT:  You just said that.

14    MR. GRADY:  Respectfully, your Honor, we have turned

15 over --

16    THE COURT:  You have said that the instructions are

17 oral.  You have turned over the written instructions, but there

18 are oral instructions.

19    MR. GRADY:  Your Honor, I said, there may be oral

20 instructions to get to the level of detail --

21    THE COURT:  What do you mean there may be?  Why don't

22 you know what there are?

23    MR. GRADY:  If I could explain to the Court, we have

24 turned over a list of --

25    THE COURT:  I don't care what you have turned over.

1  Why don't you -- why can't you answer my question?  Are there

2  oral instructions which are not -- which do not have a written

3  counter-part?  Are there workers who are being told how to make

4  this stuff without being given written instructions?

5          I don't believe that.

6          MR. GRADY:  I can't answer your question, your Honor,

7  because I don't know.

8          THE COURT:  Well, how are you going to find out?  When

9  are you going to find out?  When are you going to tell us?

10         MR. GRADY:  I will find out.  I will go back to my

11  office and immediately call my client.  I will begin the --

12         THE COURT:  You will submit an affidavit tomorrow,

13  describing the absence or the presence of written instructions

14  at all stages in the manufacture of cookies.

15         MR. GRADY:  Your Honor, you're looking for my client's

16  affidavit, correct, not mine?

17         THE COURT:  Pardon?

18         MR. GRADY:  You are looking for my client's affidavit,

19  not mine, correct?  I just want to clarify.  You said, I will

20  submit an affidavit.  You mean from my client?

21         THE COURT:  Yes.

22         Look, if you are stonewalling, I am going to enter a

23  default judgment against you because I don't -- I don't

24  tolerate these tactics.

25         MR. GRADY:  Your Honor, I am not engaging in any --

1      THE COURT:  All this stuff about the eight factories,

2   you know what's going on, and everything is mixed up.  I don't

3   believe any of that.  It's not how -- I mean, this is a major

4   company.  They don't -- they don't know what's going on in

5   factory to factory.  What's the big deal about eight factories?

6      I want your affidavit to indicate why you are not able

7   to provide the same sort of information, the same sort of

8   information that Keebler and Conopco are willing to provide.

9      Okay.  Well, thanks.  Let me move on to something

10   else.

11      MS. NOEL:  Your Honor, I am sorry to interrupt.  There

12   is one more issue with related to Topco and Bremner that we

13   would like addressed.

14      THE COURT:  No, I understand.  Yes.

15      MS. NOEL:  Topco is a separate --

16      THE COURT:  Well, before you get to Topco --

17      MS. NOEL:  On the same manufacturing process issue,

18   not --

19      THE COURT:  But Topco does manufacture, right?

20      MS. NOEL:  Well, that is what they have represented to

21   the Court, and we believe that they don't manufacture.  We do

22   not believe that they don't have any documents regarding the

23   cookie formulas of the accused products or testing of same.

24      Topco has a quality assurance laboratory that tests

25   products and provides specifications to Bremner.  We know that

1    from their product supplier agreement.  We also know it from an

2    e-mail produced by Bremner.

3           So -- and if I may, your Honor, the e-mail is -- if I

4    can find it, is somewhat enlightening.  It's Bates No. BREM

5    2823.  It's an e-mail not from the manufacturer of Bremner to

6    Topco but from Topco's technologist quality assurance,

7    technologist in their quality assurance department, to Bremner,

8    forwarding to Bremner a comparison of the formulas that Bremner

9    currently has.

10          It also states, quote, as it stands right now, neither

11   formula of vanilla wafers is approved by Topco QA.  It also

12   continues to reference the harmonization formula stands the

13   best chance but will be rejected both by Topco Q & A and our

14   other members when they learn of the score.  It continues with

15   recommendation that they lower the saturated fat in the accused

16   product.

17          Now, we weren't produced that e-mail or anything like

18   it from Topco.  In fact, I think Topco has produced less than

19   300 documents in this entire litigation.  They have a

20   laboratory that tests the accused products.  They have

21   information on formulas.

22          So we would ask that they be compelled to answer our

23   request for production of documents.

24          THE COURT:  What documents are you looking for?

25          MS. NOEL:  We are looking for, for example, any

1   testing or any commentary on the formulas used that can be --

2          THE COURT:  What would be the relevance of the

3   commentary on a formula?

4          MS. NOEL:  Well, if they are dissatisfied with a

5   formula that has trans fat in it, we want to know.  Or if a

6   noninfringing alternative formula didn't pass the right test

7   because it didn't have the right taste or feel or customers

8   didn't like it, I am -- I'm making -- I'm surmising those

9   hypotheticals, your Honor, to be fair.  I don't know any of

10  those are truth or fact.

11         But I don't believe they have no documents on

12  manufacturing of the accused products or formulation of the

13  accused products because this Bremner document seems to belie

14  it.  And their product supplier agreement between Topco and

15  Bremner provides that Bremner warrants that all products

16  supplied thereunder will comply with Topco's product

17  specification, other product specification for the accused

18  products.

19         If so they haven't been produced.  And it's been

20  represented to us repeatedly and to this Court that they have

21  no such documents.  So we ask that that be --

22         THE COURT:  Is the notion that these Topco documents

23  might show that Bremner was not using a particular recipe that

24  they said they were using or what?

25         MS. NOEL:  No.  For example, your Honor, if Topco is

1    insisting that Bremner use a formula that is infringing, that

2    would be highly relevant to the value of the infringing

3    formulation.

4         THE COURT:  Well, this is getting into the marketing

5    area, consumer demand and --

6         MS. NOEL:  It does, your Honor.  And --

7         THE COURT:  But how is it -- I thought you were saying

8    this was connected to the issue of the recipes used and how

9    many sales are associated with each recipe.

10        MS. NOEL:  It would be responsive to those requests,

11   your Honor.  It may have relevance in both pots.

12        THE COURT:  Well, I don't know how it would -- I don't

13   understand how it would -- what light it would cast on the

14   question of what recipes Bremner uses and how much sales are

15   associated with each recipe.

16        MS. NOEL:  It would perhaps, your Honor, corroborate

17   it.  But your Honor has, I believe, granted us the relief from

18   Bremner.  So to the extent it's duplicative, you know, perhaps

19   those -- that universe need not be produced for that purpose.

20   We think it's responsive and also highly relevant to the next

21   motion to compel as well.

22        THE COURT:  The marketing.

23        MS. NOEL:  The marketing.

24        THE COURT:  Okay.  Well, before we get to the

25   marketing, there is just one issue.  You were asking for the

1  defendants' licensing agreements.  Haven't you received them?

2          MS. NOEL:  Your Honor, I think by now we have -- I

3  believe we have received assurances from all the defendants

4  that to the extent those documents exist, they have been

5  produced.

6          THE COURT:  Okay.

7          MS. NOEL:  And I can only rely on that representation.

8          THE COURT:  So withdrew that.

9          So on the marketing front, so I found -- I found these

10 confusing.  So I take it this is relevant to -- this bears on

11 damages.  And the idea is to determine -- I would think the

12 idea is to determine how much the cholesterol-related features

13 in the recipe drive sales.

14         So I would think the way to look at it would be to see

15 how these -- well, I can think of two types of evidence.  One

16 would be internal studies by the defendants in which they

17 compare the costs of using a particular recipe that has, you

18 know, low cholesterol with the anticipated benefit in

19 additional consumer sales, right?  That will be logical form of

20 damage proof.

21         So that's one.  So for that, you would want to know

22 how these products are marketed to consumers?  So suppose that

23 when these cookies are sold, there is nothing on the package or

24 in any of the advertising that refers to cholesterol, that

25 would make it surprising that the infringement had any

1    consequences unless it saved money in production.

2          So shouldn't we be looking at the consumer marketing?

3          MS. NOEL:  We do want them to produce their consumer

4    marketing.

5          THE COURT:  Is that where Topco comes in?

6          MS. NOEL:  That is in part, yes, your Honor, where

7    Topco comes in.

8          THE COURT:  Actually, I don't know what Topco is.

9    Come to think of it.  What is Topco?

10         MS. NOEL:  I can defer to Mr. Grady.  We are informed

11   that it's a consortium of stores that is specifically created

12   to maximize their purchasing power and to market.  So the fact

13   that we haven't received --

14         THE COURT:  So it's a buying coop of grocery stores?

15         MR. GRADY:  I think that's correct, Judge.  We

16   would -- we refer to internally as a reseller.

17         THE COURT:  As a reseller.

18         MR. GRADY:  Reseller.

19         THE COURT:  They don't own the grocery stores, but

20   they supply them?

21         MR. GRADY:  I believe that's correct.

22         THE COURT:  Middleman.

23         And so you are interested in the market, in Topco's

24   marketing materials?

25         MS. NOEL:  Marketing materials.

1    THE COURT:  What they tell the grocery stores, you

2 know, buy this low cholesterol.

3    MS. NOEL:  Internal studies, what they tell the

4 stores, what their sales information.  You know, we don't even

5 have -- we are told the price lists don't exist.  We are told

6 they have no traditional marketing.  We keep telling them, we

7 don't know what you mean by the phrase, traditional marketing.

8 It sounds like jargon.

9    We're looking for any sort of marketing or

10 communications to assist your members to market these accused

11 products.  We are told, nothing exists at Bremner or Topco.  We

12 just find it hard to believe.

13    MR. GRADY:  Judge, that's not quite right.  There was

14 a meet and confer last Friday.  We are looking at the type of

15 marketing materials we now understand that they want.  I think

16 our initial response was, we are a private label.  We don't go

17 out and market ourselves as a brand.

18    We then understood that they wanted the type of things

19 that you've been discussing, internal -- we are looking at that

20 right now.  There was -- in fact, we committed over the phone

21 to produce those as soon as possible once we locate anything

22 that exists.

23    THE COURT:  So what's the timetable on that?

24    MR. GRADY:  Your Honor, I would say we would do

25 everything we possibly could to produce it by next Friday.

1      THE COURT:  Is that satisfactory?

2      MS. NOEL:  Your Honor, we would at the very least need

3  to then reschedule the 30(b)(6), which I believe is Tuesday.

4  There are three on Tuesday and one on Wednesday for the Topco

5  Bremner witnesses.

6      MR. GRADY:  Your Honor, right know the search is going

7  on in another law office.  So it could be that they already

8  uncovered it.  Perhaps after Court I can talk with Ms. Noel and

9  we can deal with that.

10      THE COURT:  Okay.  That will be fine.

11      Now, Brandeis has a -- so let me just ask, does Topco

12  have -- does Topco have anything to do with the recipes?  I

13  mean, were they specified at Bremner what kind of cookie they

14  wanted?

15      MR. GRADY:  I don't know that, Judge.

16      THE COURT:  So Brandeis so is requesting costs for

17  what exactly?  What are you asking costs for?

18      You're asking for costs from Bremner and Topco, is

19  that correct?

20      MS. NOEL:  You mean on this motion, your Honor?

21      THE COURT:  On what?

22      MS. NOEL:  On this motion?  Or are you speaking of the

23  internal documents?

24      THE COURT:  No.  Well, I am confused.

25      What are you seeking in -- are you seeking information

1 about costs?  Or you are seeking an award of costs?  I am

2 puzzled.

3          MS. NOEL:  Both.

4          THE COURT:  Both.  Okay.

5          MS. NOEL:  Both.  Two separate issues, your Honor.  We

6 don't believe that the conduct of the defendants has been

7 appropriate in providing this information.  We believe it's

8 been stonewalled for about 11 months.  We believe costs should

9 be shifted for having to bring these motions.

10          On the issue with Bremner and Topco, you know,

11 certainly, their price lists for the products and their

12 marketing materials are all subject to the motion, if that's

13 what your Honor is referring to.

14          THE COURT:  So this is a sanctions motion, rather than

15 seeking discovery of cost information.  That's what --

16          MS. NOEL:  Well, I believe it's both, your Honor.  I

17 believe we have sought price lists for products sold, all their

18 marketing materials, their market and market share materials.

19 We have an understanding from their Website that they subscribe

20 to IRI, which does market summaries and studies on consumer

21 demand and commercial success.  So --

22          THE COURT:  Right.  You want your -- well, this is

23 separate from -- you want their internal documents, their --

24 you would like ideally the study in which they said, well, if

25 we sell these low-cholesterol cookies, it will cost us X more,

1  but we will make Y more in sales, something like that?  Is that

2  what you are looking for?

3          MS. NOEL:  That would be information we would like.

4          THE COURT:  So you must have that?

5          MR. GRADY:  Your Honor, I can go back to my client and

6  confirm whether they have it or not.  I don't know.

7          THE COURT:  Well, wait a second.  How do they decide

8  what cookies they are going to sell?

9          MR. GRADY:  Are we talking about Bremner or Topco?

10          THE COURT:  Bremner.

11          MR. GRADY:  I would assume, Judge, there is

12  documentation internally that talks about this cookie is doing

13  great, this cookie is not doing great.

14          THE COURT:  Not doing great.  The question is, they

15  have to decide whether to make a low-cholesterol cookie.  And

16  there is a cost involved, including a risk of an infringement

17  suit.  There is a cost involved.

18          So presumably, there is some calculation of benefits.

19  How many additional sales will we get with we sell, if we tell

20  the retailers, this is great low-cholesterol cookie.  And we

21  have the most obese population in the world with all sorts of

22  heart problems.  So we will market it this way, and we will

23  hope to get, you know, X additional sales.

24          MR. GRADY:  Any documents like that, your Honor, we

25  will produce.

```
1          THE COURT:  There have to be documents like that.
2   Otherwise, I mean, you are giving me a picture of a totally
3   irresponsible, incompetent company, which doesn't have any
4   paper, does everything orally, like a pre-literate society
5   where people have really great memories because they don't have
6   any writing.
7          MR. GRADY:  I am not sure I've done my job then,
8   Judge, because that's certainly not how I want to portray my
9   client.
10          THE COURT:  So that's what they want.  I will defer
11  action on this sanctions motion to see what Bremner and Topco
12  are able to produce.
13          Does Bremner have contracts with other customers?
14          MR. GRADY:  Your Honor, except for Topco, everything
15  else is by purchase order.
16          THE COURT:  Is by?
17          MR. GRADY:  Purchase order.  In other words, there is
18  no --
19          THE COURT:  No ongoing arrangements, for example, to
20  Girl Scouts?
21          MR. GRADY:  Correct.
22          THE COURT:  Are there any other discovery problems
23  that we should talk about?
24          MS. NOEL:  Plaintiffs have no other current issues,
25  your Honor.
```

1          THE COURT:  Do the defendants?

2          MR. MANCINI:  Your Honor, John Mancini on behalf of

3   defendant Keebler.  There is one discretion issue which the

4   defendants may be filing a motion tomorrow.  But perhaps since

5   we are here, we can avoid the necessity for that.

6          One of the inventors of the patent, individual named

7   Kalyana Sundrum, if I pronounce that correctly, the plaintiffs

8   actually submitted an affidavit by him in this case.  We've had

9   some rather significant difficulties getting him confirmed for

10  a deposition.

11         And the motion was to seek to compel his deposition at

12  a very early date.  He is a key witness in this case.  There is

13  some dispute as to whether or not they have control over him.

14  We think that issue is beyond dispute since they produced an

15  affidavit from him in this case.

16         We were going to file a motion for that on Friday, per

17  the Court's motion schedule.  But perhaps we can resolve that

18  today.

19         THE COURT:  Ms. Noel?

20         MS. NOEL:  Your Honor, Dr. Sundrum is a scientist in

21  Malaysia.  We have been in communications with him.  We did

22  obtain a declaration from him.  We have also requested that he

23  provide us documents.  We have also requested that he come to

24  the United States for a deposition.

25         He has agreed in principal to come to the United

1   States in a deposition.  But his employer, with whom we have no

2   affiliation, has him traveling internationally.

3          THE COURT:  Well, why don't you have a video

4   deposition of him?  Why do you have to drag him to the United

5   States from Malaysia?

6          MS. NOEL:  Your Honor, that was our understanding of

7   the defendants' request.

8          THE COURT:  Why?  What's that about?  Why don't you

9   have a video deposition?

10          MR. MANCINI:  Your Honor, we can certainly do it by

11   video, but we need the documents as well, your Honor.

12          THE COURT:  Can't the documents be scanned and

13   e-mailed?

14          MS. NOEL:  Dr. Sundrum has represented to us that he

15   has no documents, that any documents he had he left at his

16   former employer, the Palm Oil Institute of Malaysia, otherwise

17   referred to as PORIM.  We have requested and he has told us

18   that he would earlier this month go to PORIM and request any

19   documents that they have.

20          We have had a very hard time getting ahold of Dr.

21   Sundrum in the last couple of weeks.  As recently as last night

22   a call was made to him, and the line was lost.  We don't have

23   an explanation for the Court of why that occurred.

24          We do know he has represented to us that he will be

25   traveling extensively for his job throughout the month of

1   October.  We were targeting the month of November for his

2   deposition.  We have -- we will now raise with him the

3   possibility of a video deposition.  We have made, I can

4   represent to the Court, many, many attempts to contact Dr.

5   Sundrum.  We want him to participate in this case.  I don't

6   believe we control him.

7          I also will note that the defendants have never

8   subpoenaed him and only requested his deposition rather

9   recently, knowing he is in Malaysia.  So we don't control the

10  man.  We are taking every step we can to secure his

11  participation in the case.  And we have made multiple requests

12  for documents.

13         But as I said, he said they lie with PORIM, which we

14  have no control over.  But we have requested he request them

15  from them.

16              THE COURT:  Can someone in Malaysia be subpoenaed?

17              MS. NOEL:  There is an international treaty, I

18  believe.  But I do not believe defendants have made any effort

19  to --

20              THE COURT:  Invoke it.

21              MS. NOEL:  -- invoke it.

22              MR. MANCINI:  Your Honor, two-points.  With respect to

23  the invocation of The Hague, they produced an affidavit from

24  him in this case, so we believe he has control.  But

25  furthermore, he has a contract with Brandeis where he has

1    committed to providing documents and testimony requested by

2    Brandeis, their client.

3           This is going on for some time.  All we ask is for a

4    date certain for the documents, date certain for the deposition

5    in sufficient time for our expert reports.

6           THE COURT:  Well, that's a reasonable request.  The

7    problem is, if this fellow is hard to deal with in Malaysia, I

8    don't know what exactly -- I don't know what I can do.

9           MR. MANCINI:  Well, the point is, your Honor, Brandeis

10   clearly has control.  When they wanted a declaration from him

11   they were able to obtain it in record time, file it in this

12   case.  We are surprised that then they do not have control when

13   we need him for a deposition and produce documents.  And so all

14   we --

15          THE COURT:  I don't understand.  How can Brandeis

16   control him?  I don't understand.

17          MR. MANCINI:  They have a contract with him where he

18   commits to provide documents and testimony.  And they --

19          THE COURT:  Is he breaking his contract?

20          MR. MANCINI:  If he is not going to provide document

21   and testimony, I believe he is.  But --

22          THE COURT:  But then he is not -- then he is not in

23   Brandeis' control.

24          MR. MANCINI:  Well, they produced a declaration.

25          THE COURT:  He has broken his chains, is running wild,

1    8,000 miles away.  So what am I supposed to do?

2           MR. MANCINI:  Well, to the extent Brandeis does have

3    control, they would --

4           THE COURT:  It doesn't have control.

5           MR. MANCINI:  We think they do.

6           THE COURT:  I don't understand that.  If he doesn't do

7    what he is supposed to do contractually, that severs the

8    control, right?

9           MR. MANCINI:  Well, it may.  But it begs the question

10   how they got the declaration from him in this case.  So all

11   that we're asking for is a date certain for documents and

12   deposition.  We're willing to even take the deposition by

13   video.  But we need it before the expert reports are due.  Or

14   we need relief from the expert reports because he is so

15   critical.

16          THE COURT:  Can you go to Malaysia and look for him

17   and track him down?

18          MS. NOEL:  Your Honor, we are using -- we will make

19   every effort.

20          THE COURT:  Do you have Malaysian counsel?

21          MS. NOEL:  We have used Malaysian counsel, yes, but

22   not to force a deposition or anything the like.  But we have --

23   we do have Malaysian counsel.

24          THE COURT:  I don't know what you do if --

25          MS. NOEL:  Your Honor, we certainly have an interest

1    in Dr. Sundrum participating as well.  And we will certainly

2    make every effort to have his deposition take place.  Now that

3    there is an agreement that it can be done by video, perhaps

4    that will get his little more participation.

5             THE COURT:  Easier for him.

6             MS. NOEL:  Yes.  And we alternatively offered to

7    defendants and Dr. Sundrum that perhaps it would be easier for

8    everyone, in light of Dr. Sundrum's travel, that we meet in

9    Europe, where we understood he might be going.

10            But I mean to convey to the Court that we are

11   diligently seeking his participation.  But as far as the

12   documents, what I can tell you is he has represented to us he

13   left them at PORIM.  He has requested them from PORIM.  If

14   PORIM gives them to Dr. Sundrum and we obtain them, we will

15   certainly produce them.

16            MR. MANCINI:  And --

17            MS. NOEL:  But, your Honor, you know, just because we

18   obtained a declaration from the man at the beginning of the

19   case doesn't mean we can force him to take a deposition.  I

20   don't think that shows control.

21            The other thing is, you know, defendants as far as the

22   timing and expert reports, should have started the process of

23   this a long time ago.

24            THE COURT:  Now, this declaration, is this something

25   that you would be using at the trial?

1          MS. NOEL:  Your Honor, I am not recalling the context

2     of --

3          MR. MANCINI:  I think the more serious issue is, they

4     will rely on the Sundrum study that they believe will establish

5     the cholesterolemic benefits of this alleged invention.  And if

6     they can't produce him, then at minimum we would seek that that

7     be precluded from doing that.  And that's why we need him,

8     because we know that they intend to rely on that study to prove

9     this surprising effect that they claim from their patent.  But

10    they can't do that if they can't produce him.

11         To Ms. Noel's point, I think she misspoke.  Perhaps

12    she wasn't involved in the meet and confers.  We have been

13    asking and pressing for this for some time.  We are starting --

14    and it came to a motion to compel.

15         THE COURT:  Well, there are two questions.  So the

16    first question is, assuming that Brandeis wants to use the

17    declaration in evidence, the first question is whether Brandeis

18    is hiding him, keeping him from being produced and subjected to

19    devastating cross-examination.  That's the first issue.

20         The second issue is, if not, nevertheless should his

21    declaration not be admitted in the absence of opportunity for

22    cross examination?  Does that make it like hearsay?  So you

23    could argue.  You could argue both those points right?

24         But there is nothing, nothing I can do to produce Mr.

25    Sundrum.  So it will be important for Brandeis to be able to

1   show that it has made every effort in good faith to produce him

2   in one form or another, electronic or personal.  And then you

3   will have to wrestle with the question whether the declaration

4   could be admissible in the absence of cross-examination.

5           MR. MANCINI:  Just to be clear, your Honor, it's not

6   just the declaration, but their ultimate reliance, which we

7   expect, on a study that he did in 1995 to prove these alleged

8   effects.  We believe they should not be allowed to rely on that

9   study if they don't produce him as a witness.

10          THE COURT:  Well, that's the same point.  The question

11  is, can the study be admissible when the author can't be cross-

12  examined.

13          MR. MANCINI:  Correct, your Honor.  That's my

14  clarification, both to declaration and the study.  Yes.

15          THE COURT:  That's certainly an arguable point.  I

16  should think between now and the trial it would be possible to

17  get a cross-examination, well, a deposition which would be

18  equivalent, of Sundrum somewhere.  You can always go to

19  Malaysia and cross-examine him, right?

20          MR. MANCINI:  Your Honor, we will go wherever as soon

21  as they make him available.  We just want to preserve our

22  right.  If it's beyond the expert reports, we may need some

23  relief from the expert report dates.

24          THE COURT:  Okay.  That's fine.

25          Is there anything else we ought to discuss?  I want to

1    say something about deadlines.  You know, we have a trial date.

2    We have the deadlines for expert reports.  I don't want to

3    grant any more extensions.  I want to keep the thing on our

4    existing schedule.

5            So is there anything else you want to discuss, or

6    should we call it a day?

7            MS. NOEL:  Nothing from plaintiffs, your Honor.  Thank

8    you.

9            MR. MANCINI:  Your Honor, if I may, you had invited

10   our clients, Keebler -- sorry -- Keebler, Famous Amos and

11   Murray, and Nestle to file motions for summary judgment in lieu

12   of the stipulation, per the Court's motion practice, which I

13   understand to be Friday and Monday.

14           Because they are motions for summary judgment, we

15   wanted to request -- we could file a motion for additional

16   pages.  But since we are here -- some additional pages on each

17   of those motions.  And we are -- we mean to keep them brief.

18   But your current order amounts to about five pages.

19           We were hopeful to extend that to about 20 because

20   they are motions for summary judgment.

21           THE COURT:  Any objection?

22           MS. NOEL:  No, your Honor.  We actually read your

23   Honor's order a little differently, that since defendants

24   forewent the last opportunity to file this motion by a date

25   certain set by this Court, that your Honor has instructed the

1    parties that you will consider motions pursuant to the normal

2    motions briefing schedule on summary judgment, which we took to

3    be the summary judgment schedule in your order.

4              There is a specific opening response and reply

5    schedule.  And we understood -- perhaps we presumed too much,

6    but we understood that the Court would not hold to the

7    five-page page limit for summary judgment.

8              THE COURT:  That's fine.  Sure.

9              MR. MANCINI:  So we're clear, the normal briefing

10   schedule is Friday, Monday.  It's not the dates that are

11   identified.  That's what we understand the Court's order to

12   mean.  Because we do intend -- these should not be here longer.

13   We do intend file quick summary judgment motions on behalf of

14   them and resolve those issue that the parties have already

15   stipulated to.

16             So we would hope to do that rather soon.

17             THE COURT:  Okay.

18             MR. MANCINI:  Thank you, your Honor.

19             MS. NOEL:  Your Honor, we had understood that they

20   would come with summary judgment.  I think we've heard of the

21   prejudice frankly that defendants have put us in in holding

22   back discovery.  Your Honor has heard a little bit of the

23   deposition schedule defendants are putting us through.  We have

24   expert reports.

25             We are not going to get another extension as your

1    Honor has stated.  To add summary judgment into this mix right

2    now seems --

3          THE COURT:  Burdensome.

4          MS. NOEL:  It does seem burdensome.

5          MR. MANCINI:  Your Honor, with all due respect, they

6    already stipulated to noninfringement.  The only question that

7    we believe will be in dispute on these summary judgment motions

8    is to whether these entities should receive final judgments

9    pursuant to Rule 54(b).  They stipulated to noninfringement to

10    all the other issues.  We don't think this is going to be

11    burdensome at all for Ms. Noel and her colleagues.

12          THE COURT:  So, Ms. Noel, you can have -- you can have

13    an extension to reply.  Would that --

14          MS. NOEL:  That would help, your Honor.

15          THE COURT:  Okay.  How much would you like?

16          MR. MANCINI:  So for context, we expect that we would

17    file our motions next week, probably next Friday, your Honor.

18          MS. NOEL:  Your Honor, if we could have two weeks

19    after opening expert reports are due.

20          THE COURT:  When would that be?  When would that be,

21    roughly?

22          MR. MANCINI:  We don't think that works.  That would

23    take it all the way out to November 21 for an opposition that

24    we would file on or about October 26.  That makes it almost

25    essentially a month to reply to a motion that, again, they

1    stipulated to noninfringement.  The only issue that remains in

2    dispute is whether it should be a final judgment.

3         THE COURT:  Whether what?

4         MR. MANCINI:  There should be a final judgment with

5    respect to these entities.

6         THE COURT:  You mean a Rule 54(b) judgment?

7         MR. MANCINI:  Correct, your Honor.  We expect that

8    that will be the only issue in dispute in these motions for

9    summary judgment.

10        THE COURT:  Now I am confused.

11        MR. MANCINI:  Yes, so let me --

12        THE COURT:  You submitted those motions, those

13   elaborate motions, for summary judgment and the references to

14   Rule 54(b) and all that.  Is that --

15        MR. MANCINI:  Yes.  So let me reset the date.  Per the

16   Court's order of October 4, because it was clear, based on the

17   Court's Markman ruling, Nestle USA and Famous Amos with respect

18   to all its claims, Murray Biscuit and Keebler with respect to

19   most of its claims, would not be infringing.  The parties

20   agreed to stipulations and proposed orders.

21        Court in its most recent order said that those

22   proposed orders and stipulations were unnecessarily

23   contemplated -- complicated and asked the parties to move for

24   summary judgment.

25        Similarly in the October 4 order, the Court asked the

1  parties to move for summary judgment by schedule.  We were to

2  file by October 9.  They were to apply -- oppose by October 12.

3  Because the parties met and conferred and realized there was no

4  dispute about noninfringement, we did stipulations in lieu of

5  motions for summary judgment.

6      So the Court's most recent order of October 15 asked

7  us to renew those motions because it did not accept the

8  stipulation.  Again, we don't think there is really anything in

9  dispute because we stipulated to noninfringement.  The Court

10 under its powers deemed the proposed orders to be unnecessarily

11 complicated.

12     So we think that that goes to only the question of

13 finality because noninfringement has been stipulated to.  And

14 the finality can be briefed in two pages each.

15     THE COURT:  Finality what?

16     MR. MANCINI:  Finality under in 54(b) we think is a

17 discrete issue that shouldn't take Ms. Noel and her colleagues

18 nor us more than a couple pages to brief.  The question is

19 whether or not the summary judgment should be final for purpose

20 of appeal or not.  That's really the only question that I

21 perceive to be in dispute between the parties.

22     THE COURT:  What's the answer?

23     MR. MANCINI:  So we believe, your Honor, with respect

24 to Nestle USA, because there are no remaining claims, that

25 answer is clear that there ought to be finality.  And to the

1    extent that consolidation complicates the question as the

2    Court, your Honor --

3              THE COURT:  So Nestle is out of the case.  So does

4    this mean that Brandeis would want to appeal, or not?

5              MS. NOEL:  Brandeis, your Honor, at this stage does

6    intend to appeal the claims construction.

7              THE COURT:  I'm sorry, Brandeis what?

8              MS. NOEL:  Brandeis would appeal at this juncture the

9    claims construction ruling, which is what triggered us under

10   our ethical obligations to stipulate to the dismissal.  And

11   then the problem we have there, obviously the cases would have

12   to be deconsolidated.  And then some of the defendants would go

13   up to the Federal Circuit while this case is still going on the

14   same patents, on the same issues.

15             We certainly could ask the Federal Circuit and in

16   light of judicial efficiency to stay that.  I am not sure what

17   all of these actions are really going to get besides a lot more

18   time and expense on the parties.  They will be suffering no

19   prejudice if they have a nonfinal order until this case is up.

20             And in the meantime, they will be subjecting Brandeis

21   either to be arguing in the Federal Circuit at the same time or

22   arguing for a stay of that appeal.  If the cases remain

23   consolidated, then there should not be a final order.  This

24   case should go up, if it ever does, to the Federal Circuit at

25   one time.

1    MR. MANCINI:  Just two points, your Honor.  With

2    respect to prejudice, again, I think Ms. Noel misspoke because

3    the stipulation spoke to this.  The prejudice is, if the order

4    is not final, Nestle USA, for example, for which I think Ms.

5    Noel concedes there are no viable claims post the Markman

6    ruling, will be liable for damages between the time of the

7    nonfinal order and its potential reversal, which with all due

8    respect we don't think will occur.

9        So in that stipulation the parties accommodate for

10   that, and they waive the ability for -- to collect damages for

11   that interim period, which is why Nestle agreed to stipulate to

12   a nonfinal judgment.

13       But absent that, we need finality because we need to

14   know if we continue to sell these Tollhouse cookie doughs, we

15   don't subject ourselves to damages because we don't believe we

16   do.  We don't believe they infringe based on the Court's

17   Markman ruling.  So that's the first question.

18       As to the second question about the consolidation,

19   there is no good reason that Nestle USA shouldn't be

20   deconsolidated now.  The case is over with respect to it.  And

21   by the way, similarly with respect to Famous Amos and Murray

22   Biscuits.  The case is over with respect to those entities.  If

23   they are deconsolidated, then under 54(b) there is just cause

24   to enter a final judgment and have this issue appealed, if they

25   seek to appeal it.

1          THE COURT:  If they what?

2          MR. MANCINI:  If they seek to appeal.

3          The defendants do not.  Defendants have received

4     noninfringement.  We do not seek to appeal the Markman ruling.

5     But I take it that as Ms. Noel has represented they do.

6          THE COURT:  So you would want to appeal.

7          MS. NOEL:  Yes, your Honor, we would.

8          THE COURT:  You have to appeal.

9          MS. NOEL:  We would have to appeal and we'll be under

10    a time clock.  And then we will be on two separate tracks

11    unless the Fed Circuit stays the Nestle, Famous Amos --

12          MR. MANCINI:  Murray Biscuit.

13          MS. NOEL:  -- Murray Biscuit, thank you, counsel,

14    appeal which, you know, I don't presume to know what the

15    Federal Circuit would do.  My hope and expectation is they

16    would stay.  So we are left in the same position.  Or even

17    worse, they won't stay it.  We'll be fighting the appeal and

18    litigating this case at the same time.

19          Counsel spoke to the prejudice, to the damages.  They

20    have our stipulation.

21          THE COURT:  Why don't I -- what's the objection to my

22    doing nothing?

23          MR. MANCINI:  The objection, your Honor, is that there

24    are entities, Nestle USA, Keebler and Murray, that need some

25    finality since there are now stipulation of noninfringement.

1   They need some order indicating that the case is over with

2   respect to it, for several reasons.  One, as I mentioned, the

3   potential for ongoing damages which we need to resolve.  I

4   think the stipulation addressed it.

5            And I'm not suggesting, unless the Court is willing to

6   entertain this, that we go back to the stipulation because it

7   did address it.

8            The second is, they are public companies.  They have

9   reporting obligations that the case is open.  It should not be

10  open against them.

11           But primarily, most significantly is this risk

12  exposure for damages that should be resolved.  The parties did

13  resolve it by stipulation.  We understand, it was perhaps a

14  little bit complex.  But we need to resolve it either by

15  stipulation or by motion practice.

16           THE COURT:  Yell, I don't understand.  Suppose

17  Brandeis -- suppose when the entire case is over and suppose

18  you guys, defendants, lose and appeal.  And Brandeis appeals

19  the dismissal of Nestle.  And suppose there is a reversal.  And

20  so Nestle loses.

21           Well, there would be nothing wrong with Nestle having

22  paid damages for that period, correct?

23           MR. MANCINI:  Well, there is in this respect, your

24  Honor:  If there is a final judgment, Nestle can rest

25  comfortably that it can continue to sell these products

1  without --

2       THE COURT:  No, it can't because there is an appeal at

3  the end of the --

4       MR. MANCINI:  Yes.

5       THE COURT:  There is going to be an appeal.

6       MR. MANCINI:  But because it can reasonably rely on

7  the final judgment from the Court, it won't be liable for

8  damages from the time of that final judgment to reversal.

9       THE COURT:  Wait, I don't understand.  Is it because

10 Brandeis will have only 30 days to appeal?

11      MR. MANCINI:  No, it's because under the law, because

12 of its finality with respect to the claims.

13      THE COURT:  I don't understand finality when the order

14 is appealable.

15      MR. MANCINI:  Yes, the law -- and I agree.  It doesn't

16 make the most logical sense -- doesn't allow our client to be

17 relieved of a damage claim if it's a nonfinal judgment but does

18 allow us to be relieved of the damage claim if it is a final

19 judgment until it is reversed.  It actually does make sense

20 because if it's a final judgment, the company, Nestle, can rest

21 comfortably that its products don't infringe and it can

22 continue --

23      THE COURT:  But if there is a final judgment, then

24 Brandeis has to appeal.

25      MR. MANCINI:  They have to appeal.  So in the

1  stipulation what we agreed to do, Brandeis waived its right to

2  collect any damages should it be reversed between a nonfinal

3  judgment and an appeal.  That's what the stipulation addressed

4  to accommodate this concern, which is why Nestle agreed, said

5  fine, we will take it as a nonfinal judgment as opposed to

6  final.

7          THE COURT:  So you agreed to that?

8          MS. NOEL:  We did, your Honor.  But it was predicated

9  on it being a nonfinal judgment as opposed to a final judgment

10  and forcing us to go through --

11          THE COURT:  So aren't you both in agreement?

12          MR. MANCINI:  We are in agreement, your Honor.

13          THE COURT:  So what's the problem?

14          MR. MANCINI:  The only problem is --

15          THE COURT:  Briefs.

16          MR. MANCINI:  The only problem is, the Court declined

17  to enter the proposed order, asked --

18          THE COURT:  Because it was so complicated.  Can't you

19  write this up in a couple sentences?

20          MR. MANCINI:  So perhaps that is the solution.

21          THE COURT:  You two should get together and submit,

22  you know, one document with your agreement and make it very,

23  very simple.  Okay.  I am afraid to sign things I don't

24  understand.

25          MR. MANCINI:  Understand, your Honor.

1          THE COURT:  I don't know where they are going to lead.

2          MR. MANCINI:  With Noel -- Ms. Noel's acceptance, I

3    believe we can do it and do that quickly and present proposed

4    orders.  And these issues will be resolved.

5          THE COURT:  Okay.  Great.

6          Okay.  Then I think we are all set.  So thank you very

7    much.  And we will be in further touch obviously.

8       (Which were all the proceedings had at the hearing of the

9        within cause on the day and date hereof.)

10                          CERTIFICATE

11          I HEREBY CERTIFY that the foregoing is a true, correct

12   and complete transcript of the proceedings had at the hearing

13   of the aforementioned cause on the day and date hereof.

14

15    /s/Alexandra Roth                        10/19/2012

16    Official Court Reporter                    Date
      U.S. District Court
17    Northern District of Illinois
      Eastern Division
18

19

20

21

22

23

24

25